WASHBURN, J.
Mrs. Eunice Kinch, in contemplation of a trip to England, executed her will on April 29, 1915, and, together with her son, William Mustoe Kinch, sailed on the Lusitania from New York about May 1,1915.
The Lusitania, while .off the coast of Ireland, was torpedoed by a German submarine on May 7, 1915, at a little after two o’clock p. mv and sank in about twenty minutes, and both Mrs. Kinch and her son perished in the disaster.
By the will of Mrs. Kinch she bequeathed $5,000 to Liberty B. Ware, as trustee for her said son, directing said trustee to invest said sum and pay the income, after deduction of expenses, to said son in annual installments until he arrived at the age of thirty-five years, and then to pay the principal to him.
Liberty B. Ware, who is also executor of the estate of Eunice Kinch, brought this action, requesting the direction of the court as to the disposition of said $5,000, and also .requesting the construction of another item of the will, which has been disposed of by agreement of the parties.
Liberty B. Ware, as trustee, filed an answer praying also for the instruction of the court as to said matters.
William H. Chapman is the administrator of the estate of said son, and by proper pleading is claiming that said son survived his mother, and that he, as said administrator, is entitled to said bequest.
Legatees under the residuary clause of said will of Eunice •Kinch, claim that said son did not survive his mother, and that said bequest lapsed and passed to them under the residuary clause of the will.
Other defendants, brothers and sisters of Eunice Kinch, filed answers claiming said bequest lapsed and that it did not pass to the residuary legatees, but became intestate property and should be distributed, one-half to them and one-half to the brother of the deceased husband of Eunice Kinch from whom she inherited the property, under Sec. 8574 G. C.
The record is largely made up of the testimony of survivors of said disaster, for it is recognized that if said son survived his 'mother, the estate vested and the bequest should go to his administrator.
*549 As said son did not leave issue surviving his mother, the common law rule applies, and no estate vested in him unless he survived his mother. It therefore follows that the burden of proving survivorship of the son is upon his administrator. We do not feel that the fact that this legacy was given to a trust.ee for the son changes the rule as to the burden of proof, for the trustee could not take a beneficial interest for the son unless the son was alive at the time of the death of his mother, and the foundation of the claim of the son’s administrator in this case is that the trustee took a beneficial interest for the son, which by his death passed to such administrator.
To state the proposition in another way: Where there is no presumption that two persons who perish in a common disaster die at the same time, still if there is no evidence which establishes by the degree of proof required that one or the other died first, when the fact of survivorship can not be ascertained and the law is applied as if they both died at the same time. In other words, the impossibility of proving which died first, so far as the question of burden of proof is concerned, leads to the same conclusion as a presumption that they both died at the same time.
If the mother and son both died at the same time, the administrator of the son has no interest in the funds in question, and if he has any such interest it is because the son survived the mother, therefore the burden of proving survivorship is upon the administrator.
On the question of survivorship, the party having the burden of proof is not aided by any presumption and has no presumption to overcome. It is purely a matter of evidence. If there is no evidence on the subject, or if the evidence does not establish a probability, the party having the burden fails. In eases where the evidence is conflicting or where the inferences to be deduced from different proven facts are conflicting, the degree of proof to sustain the burden is greater than where the uncertainty results from merely the meagerness of the evidence. In the latter case very slight evidence may be sufficient to sustain the burden of proof, for courts settle questions of fact upon probabilities rather than upon certainties, although mere possibilities will not sustain a legitimate inference of the existence of fact. Cincinnati, H. & D. Ry. v. Frye, 80 Ohio St. 289 [88 *550 N. E. 642; 131 Am. St. 709]; Davis v. Guarnieri, 45 Ohio St. 471 [15 N. E. 350; 4 Am. St. 548],
If there is no evidence in this record beyond the fact that the mother and son perished in a common disaster, we can make no. finding as to survivorship, but there is some evidence in the record on that subject, from which, it is claimed, the natural inference is that one probably survived the other. It was not an unknown calamity or one of instantaneous operation, nor yet one to which there were no surviving witnesses. It is clearly a case to be determined by the evidence, although the conclusion we reach may not be a certainty, and there may remain some obscurity and doubt; still, if the,evidence gives rise to not merely conjecture, but is such as creates a probability and leads a fair-minded man to a conclusion in which he can honestly say he is convinced, that is all that is required.
The evidence discloses that the Lusitania was a passenger vessel, slightly more than 750 feet long and about 88 feet in breadth, and that it had six decks for the accommodation of passengers, known as A, B, C, D, E and F; decks A, B and C, being farthest up from the water, were open decks, while there was no open promenade on decks D, E and F. Mrs. Hindi, who was forty-five years of age, occupied cabin D-92, and her son, twenty years old, occupied cabin D-90, both on D deck and close together, and both were second-class cabins. There were over 1,250 passengers in all and only approximately thirty-five per cent, of the passengers were saved.
The vessel was near the coast of Ireland. The day was clear, and the ocean calm. The torpedo struck the vessel on the starboard, or right-hand side, somewhat forward of midships, tearing a hole in her side, but the explosion was not loud and the officers of the boat acted for a time, at least, upon the theory that there was no immediate danger of the vessel sinking, but very soon after the explosion' — almost immediately — the vessel started to list to starboard and to sink by the bow, the stern raising somewhat, and she continued to sink in that manner, bow first and listing to the right, until she disappeared gradually and with comparative little or no suction, about twenty minutes after being torpedoed. The listing of the vessel prevented use of the lifeboats on the port side, but a few boats were *551 launched from the starboard side, some of which were overturned in the launching. Some passengers jumped into the water before, and just as the vessel went down, and many went down with the vessel. As has been said, Mrs. Kinch occupied cabin D-92 on D deck and her son occupied cabin D-90 on D deck. These cabins were in the stern of the boat, the end of the vessel last to go under water.
The testimony is conflicting as to when the water reached the part of D deck where these cabins were, but the evidence establishes that these cabins were under water an appreciable time before that part of A deck, which was above these cabins, was under water.
Mrs. Kinch was not seen after the torpedo struck, but there is in the record the testimony of a witness who was with the son at the time the torpedo struck, and who saw him on A deck, 28 feet above D deck, at the time the boat disappeared. He was on A deck on the part of the vessel last to go under the water.
If at that time his mother was in her cabin on D deck, it is certain that she perished before the son. The testimony as to her whereabouts, is as follows:
Arthur Gasden, a survivor, testified that he knew Mrs. Kinch; that he occupied cabin D-90 with the son, which was close to cabin D-92 occupied by Mrs. Kinch; and three times in his testimony he swears positively that Mrs. Kinch was in her cabin on D deck when the boat went down. How he knows that, does not appear from the evidence. His testimony was taken by deposition and was given in answer to interrogatories, and there were no cross-interrogatories or cross-examination. There is testimony that it was the custom of Mrs. Kinch to take a nap after the noon-day meal, and that the son put in the time after the torpedo struck looking for his mother and did not find her. Mr. Gasden testifies that he was with the son on A deck at the time the torpedo struck, and that he and the son started to go to the cabins in question on D deck, and that when they got part way down between C and D decks they turned back on account of water being on D deck.
The testimony of other witnesses is such that if this trip was undertaken immediately after the torpedo struck, or at any time within a few moments before the vessel disappeared, the *552 probabilities are that there was no water on D deck at that time, so that there was ample time for Mrs. Kinch to leave her cabin and go up higher on the boat. The testimony of Gasden is that he and the son turned back, and he secured a lifebelt from a cabin on C deck, and that they then separated, the son having said on the way down that he would try to get to and save his mother; and that later on he met the son on A deck, and that he said that he had tried and could not find his mother; that this statement was made very shortly before the vessel disappeared and while the son and the witness were on A deck, above D deck, that being the part of the vessel last to disappear under the water, and that the witness jumped into the water and last saw the son standing on said part of A deck just before the vessel disappeared. The testimony of this witness is not contradicted in any particular except that there was not water on D deck until shortly before the vessel disappeared.
There is testimony of other survivors who occupied cabins on D deck near Mrs. Kinch, who left their cabins after the torpedo struck and survived, and of course there is the possibility that Mrs. Kinch was some place else in the boat, or that she left her cabin and escaped to the top deck and either got into some of the life boats that were wrecked or went down with the boat, or that she jumped overboard before the final disappearance of the vessel, but the testimony is that the son was looking for her and did not find her, and that Gasden, the' witness knew her and did not see her; that both of them were moving about in different parts of the ship and that she was not seen.
Gasden was in a position where he would likely know something about the whereabouts of Mrs. Kinch. He occupied a cabin with her son and in close proximity to her cabin. He knew of her habits and condition. He started with the son to her cabin. He knew that he did not see her any place, and he knew that the son was looking for her and did not see her, and he testified positively that she was in her cabin. Cross-examination might have weakened or strengthened his statements, but we are of the opinion, considering all the facts and circumstances disclosed by the record, that the evidence preponderates in favor of the claim that the mother was in her cabin and that the son survived her.
*553 It follows that a decree may be drawn directing the executor to pay said bequest with interest from May 7, 1916, to William H. Chapman, administratof of said son, less general taxes on said bequest and less all unpaid costs in common pleas court and in this court in this action, and in case No. 2208 in this court, which costs shall include a fee of $500 hereby allowed Liberty .B. Ware.
Judgment accordingly. Case No. 2208 dismissed, no record.
Grant and Dunlap, JJ., concur.